# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **RANDALL & KELLY ANTHONY,** | ) | |
| **CLEVER BONILLA,** | ) | **FILED** |
| **CHURCH ON THE ROCK OF KATY,** | ) | DEC 21 2017 |
| **INC.,** | ) | U.S. COURT OF |
| **KARINA CASTILLO,** | ) | FEDERAL CLAIMS |
| **SANDRA W. CURRY** | ) | |
| **JAMAL EL-ISSA,** | ) | |
| **LISA ELLIOT,** | ) | |
| **GREG ESCOFFERY,** | ) | |
| **CHI IHEK,** | ) | |
| **PATRICK NGUYEN,** | ) | |
| **NKECHI OKOLI,** | ) | |
| **ELICA ORTEGA,** | ) | **17-2004 L** |
| **GLENN REIFSCHNEIDER,** | ) | Case No._____ |
| **HOLLI RICHARDSON,** | ) | Judge_____ |
| **JOHN RINALDI,** | ) | |
| **ARMANDO RUIZ,** | ) | |
| **TRACY SANDIFER,** | ) | |
| **EKPIN UDUAK,** | ) | |
| **VERONICA VENTURA,** | ) | |
| **JOYCE WHITE, and** | ) | |
| **KAREN WILLIAMS,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiffs, Randall and Kelly Anthony, Clever Bonilla, Church on the Rock of Katy, Inc.,

Karina Castillo, Sandra W. Curry, Jamal El-Issa, Lisa Elliott, Greg Escoffery, Chi Ihek, Patrick

Nguyen, Nkechi Okoli, Elica Ortega, Glenn Reifschneider, Holli Richardson, John Rinaldi,

Armando Ruiz, Tracy Sandifer, Ekpin Uduak, Veronica Ventura, Joyce White, and Karen

Willimas bring this suit against the United States through the U.S. Army Corps of Engineers

("Corps") seeking just compensation from the United States' use of and damage to their real and personal property during and after Hurricane Harvey.

## I.
## JURISDICTION

1.1     This action arises under the Fifth Amendment to the Constitution of the United States of America.  Plaintiffs seek just compensation in excess of the jurisdictional minimum of $10,000 required to bring suit in this Court by 28 U.S.C. § 1491(a)(1).  Therefore, jurisdiction and venue are proper in this Court.

## II.
## PARTIES

2.1     Plaintiffs are all individuals asserting claims, not as a class, but independently for compensation for property taken by federal-controlled flood-water captured and stored within the Addicks and Barker reservoirs, beginning the last week of August 2017.  Specifically, Plaintiffs are:

2.2     Plaintiffs Randall and Kelly Anthony are homeowners who reside in Katy, Texas. Mr. and Mrs. Anthony own a single-family home located at 21203 Somerset Park Lane, Katy, Texas 77450.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Mr. and Mrs. Anthony seek to recover just compensation from the Corps for its taking of their real and personal property for public use.

2.2.1   Plaintiff Clever Bonilla is a homeowner who resides in Richmond, Texas.  Mr. Bonilla owns a single-family home located at 7010 Angel Oaks Courts, Richmond, Texas 77407. As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its

retention system, Mr. Bonilla seeks to recover just compensation from the Corps for its taking of his real and personal property for public use.

2.2.2    Plaintiff Church on the Rock of Katy, Inc. is a Texas corporation whose principal place of business is in Harris County, Texas.  Plaintiff owns business property located at 433 S. Barker Cypress, Houston, Texas 77094 and residential property at 15763 Tanya Circle, Houston, Texas 77079.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Church on the Rock of Katy, Inc. seeks to recover just compensation from the Corps for its taking of its real and personal property for public use.

2.2.3    Plaintiff Karina Castillo is a homeowner who resides in Richmond, Texas.  Ms. Castillo owns a single-family home located at 7010 Angel Oaks Courts, Richmond, Texas 77407. As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Ms. Castillo seeks to recover just compensation from the Corps for its taking of her real and personal property for public use.

2.2.4    Plaintiff Sandra W. Curry is a homeowner who resides in Richmond, Texas.  Ms. Curry owns a single-family home located at 17503 Chestnut Trail, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Ms. Curry seeks to recover just compensation from the Corps for its taking of her real and personal property for public use.

2.2.5    Plaintiff Jamal El-Issa is a homeowner who resides in Richmond, Texas.  Mr. El-Issa owns a single-family home located at 7330 Autumn Bluff Lane, Richmond, Texas 77407.  As

a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Mr. El-Issa seeks to recover just compensation from the Corps for its taking of his real and personal property for public use.

2.2.6    Plaintiff Lisa Elliott is a homeowner who resides in Richmond, Texas.  Ms. Elliott owns a single-family home located at 7007 Apple Oak Court, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Ms. Elliott seeks to recover just compensation from the Corps for its taking of her real and personal property for public use.

2.2.7    Plaintiff Greg Escoffery is a homeowner who resides in Richmond, Texas.  Mr. Escoffery owns a single-family home located at 7006 Clustering Oak Court, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Mr. Escoffery seeks to recover just compensation from the Corps for its taking of his real and personal property for public use.

2.2.8    Plaintiff Chi Ihek is a homeowner who resides in Richmond, Texas.  Mr. Ihek owns a single-family home located at 7615 Harvest Mill Lane, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Mr. Ihek seeks to recover just compensation from the Corps for its taking of his real and personal property for public use.

2.2.9   Plaintiff Patrick Nguyen is a homeowner who resides in Richmond, Texas.  Mr. Nguyen owns a single-family home located at 7303 Brighton Glen Lane, Richmond, Texas 77407. As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Mr. Nguyen seeks to recover just compensation from the Corps for its taking of his real and personal property for public use.

2.2.10  Plaintiff Nkechi Okoli is a homeowner who resides in Richmond, Texas.  Mr. Okoli owns a single-family home located at 6702 Oakleaf Trail Lane, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Mr. Okoli seeks to recover just compensation from the Corps for its taking of his real and personal property for public use.

2.2.11  Plaintiff Elica Ortega is a homeowner who resides in Richmond, Texas.  Ms. Ortega owns a single-family home located at 7703 Northfork Hollow Lane, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Ms. Ortega seeks to recover just compensation from the Corps for its taking of her real and personal property for public use.

2.2.12  Plaintiff Glenn Reifschneider is a homeowner who resides in Houston, Texas.  Mr. Reifschneider owns a single-family home located at 15619 Sandy Hill Drive, Houston, Texas 77084.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of

its retention system, Mr. Reifschneider seeks to recover just compensation from the Corps for its taking of his real and personal property for public use.

2.2.13  Plaintiff Holli Richardson is a homeowner who resides in Richmond, Texas.  Ms. Richardson owns a single-family home located at 7350 Eden Crossing Lane, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Ms. Richardson seeks to recover just compensation from the Corps for its taking of her real and personal property for public use.

2.2.14  Plaintiff John Rinaldi is a homeowner who resides in Houston, Texas.  Mr. Rinaldi owns a single-family home located at 529 Barker Clodine Road, Houston, Texas 77094.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Mr. Rinaldi seeks to recover just compensation from the Corps for its taking of his real and personal property for public use.

2.2.16  Plaintiff Armando Ruiz owns a single-family home located at 7914 Talladega Spring Lane, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Mr. Ruiz seeks to recover just compensation from the Corps for its taking of his real and personal property for public use.

2.2.17  Plaintiff Tracy Sandifer is a homeowner who resides in Richmond, Texas.  Ms. Sandifer owns a single-family home located at 18042 Oakridge Canyon Lane, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of

its retention system, Ms. Sandifer seeks to recover just compensation from the Corps for its taking of her real and personal property for public use.

2.2.18  Plaintiff Ekpin Uduak is a homeowner who resides in Richmond, Texas.  Mr. Uduak owns a single-family home located at 7715 Forest Cross Lane, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Mr. Uduak seeks to recover just compensation from the Corps for its taking of his real and personal property for public use.

2.2.19  Plaintiff Veronica Ventura is a homeowner who resides in Richmond, Texas.  Ms. Ventura owns a single-family home located at 17607 Trinity Meadow Lane, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Ms. Ventura seeks to recover just compensation from the Corps for its taking of her real and personal property for public use.

2.2.20  Plaintiff Joyce White is a homeowner who resides in Richmond, Texas.  Ms. White owns a single-family home located at 17515 Big Oaks Grove, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e, the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Ms. White seeks to recover just compensation from the Corps for its taking of her real and personal property for public use.

2.2.21  Plaintiff Karen Williams is a homeowner who resides in Richmond, Texas.  Ms. Williams owns a single-family home located at 17710 Camden Oaks Lane, Richmond, Texas 77407.  As a result of the Corps' design and operation of the Addicks/Barker reservoir system, i.e,

the Corps deliberate storage of government-controlled water on adjacent private land as if part of its retention system, Ms. Williams seeks to recover just compensation from the Corps for its taking of her real and personal property for public use.

2.3    Defendant is the United States Government, including the Corps and any federal, state, or local agency or instrumentality working under the auspices of the federal government, all of whom may be served through the National Courts Section, Commercial Litigation Branch, Civil Division U.S. Department of Justice, Washington, DC 20530; telephone: 202-514-7300.

### III.
### NO PREVIOUS LAWSUITS

3.1    Plaintiffs have not begun any other lawsuits in state or federal court dealing with the same or similar facts involved in this action.

### IV.
### STATEMENT OF THE CLAIM

4.1    The Corps operated and designed a system of reservoirs in west Houston that resulted in sustained flooding of Plaintiffs' residences to such extent to operate a taking for public use.

4.2    The Corps owns and operates the Addicks and Barker Reservoirs (collectively "Reservoirs"), which were completed in 1948 to prevent flooding of downtown Houston and Buffalo Bayou ("Bayou").

4.3    Between August 25, 2017 and August 29, 2017, Hurricane Harvey hit Houston bringing with it rainfall for over four days.  Despite Hurricane Harvey's heavy rainfall, which caused many areas in Harris County and Fort Bend County to flood, most Plaintiffs suffered no such flood damage, and none suffered any flood damage as a result of that heavy rainfall comparable to the flood damage caused by the subsequent reservoir waters.

4.3     In the 1940s, the Corps addressed Houston's recurring problem of stifling rain and unpredictable flood paths by designing and developing the Barker[1] and Addicks[2] reservoir system. The Corps has continued to own and operate these reservoirs since that time.

4.4     The Reservoirs' primary objective is to prevent or reduce flood damage downstream along the Bayou corridor by holding as much floodwater as possible during significant weather events.  The dam gates are situated at the northeast corner of the Barker reservoir and at the south-east side of the Addicks.  Both Reservoirs drain into tributaries that unite in the Bayou, which crosses through Houston from the west-side reservoirs, through downtown, through the east side and into the Houston Ship Channel.  The gates are opened and closed at the Corps discretion. The Corps holds the water in the Reservoirs when closing the dam gates.  Auxiliary spillways are designed for water to flank around its sides, as opposed to the reservoir pools overtopping the crest elevation.

4.5     In a typical non-flooding situation, the Corps opens the conduit gates to pass low-flow water (i.e. 300-500 cfs) down the Bayou so as to keep the Reservoirs empty and dry.  When rains occur in the Reservoirs' watershed that are insufficient to cause downstream flooding, the Corps operates the Reservoirs so that their combined releases, together with downstream runoff between the dams and the Piney Point station, do not exceed 2,000 cfs.  When the Corps predicts

---

[1] The Barker Reservoir and Dam consists of an earthen embankment that is 71,900 feet long, which runs along the south, east, and northern sides of its reservoir.  There is no embankment on its west side.  The top of the dam elevation ranges from 110.0 to 113.1 feet.  Barker's design pool elevation is approximately 106 feet, and maximum project storage capacity is 209,000 acre-feet.  Barker Dam includes auxiliary spillways at the northern and southern ends of the dam.  The northern auxiliary spillway is roughly 3,000 feet long, with an average crest elevation of 105.5 feet. The southern auxiliary spillway is roughly 12,500 feet long, with an average crest elevation of 106.7 feet.

[2] The Addicks Dam consists of an earthen embankment that is 61,166 feet long, which runs along the south and east sides of its reservoir.  There is no embankment on its west or north sides.  The top of the dam elevation ranges from approximately 117.4 feet to 121 feet.  Addicks' design pool elevation is approximately 115 feet, and maximum project storage capacity is 200,800 acre-feet.  Addicks Dam includes tow Auxiliary spillways at the northern and southern ends of the dam.  Its northern auxiliary spillway has an average crest elevation of 112.5 feet.  The southern auxiliary spillway is roughly 10,500 feet long, with an average crest elevation of 115.5 feet.

or observes significant rainfall sufficient to cause downstream flooding, it closes the conduit gates to detain and hold floodwater, thereby protecting downstream properties.

4.6     The Corps keeps the gates closed until flows at the Piney Point station stabilize such that releases can be made without risk of downstream flooding, or until the Reservoirs' pool elevations rise to such an extent to require emergency releases.  After it deems that the threat of downstream flooding has passed, the Corps opens the gates to release the impounded floodwater down the Bayou until the Reservoirs are empty.

4.7     Accordingly, these Reservoirs protect downstream structures by serving as "detention" basins (i.e., the detain floodwater that would otherwise flow into the Bayou).  The Corps designs, operates, and controls the Reservoirs so that all land within their respective project boundaries – including those beyond the government owned land ("GOL") – will store the purposefully impounded floodwater.

### Flow Rates and Pool Size Impacted by Limits on Government Owned Land

4.8     The Corps recognized what the above figures reflect, that "[b]oth Addicks and Barker Dams can impound or store more water than the Corps owns real estate to store it on."

4.9     The Corps began acquiring some of the real property that would become part of the GOL in the early 1940s.  Upon information and belief, the Corps only purchased land within the 100-year pool level (i.e., the pool elevation associated with a 100-year flood).

4.10    In summary, the Addicks and Barker have, respectively, 42% and 60% of their storage capacity beyond the GOL limits.  Accordingly, pool elevations from any significant rainfall will inevitably result in the intentional storage of impounded floodwater on private property in the "fringe areas" that extend beyond the GOL limits but are within the Reservoirs' respective pool areas.  Upon information and belief, the Corps does not own any property in this "fringe area",

never attempted to purchase an inundation, flowage, or drainage easement, and never obtained permission from any landowners in the "fringe area" to store impounded floodwater on their tracts. These "fringe areas" comprise roughly 8,700 acres.

4.11    In addition to the existing limitations of the reservoir capacity, the corps was also aware that increased urbanization, coupled with the Corps' standard Reservoir regulation procedures, would lead to bigger, longer, and more frequent impoundments of floodwater.  A USGS study had hypothesized that "complete urbanization increases the magnitude of a 2-year flood nine times and increases the magnitude of a 50-year flood five times".  The Corps Chief of Operations Division summarized the Corps' knowledge of these factors in an internal email, which stated in part that:

> These changes in the dams and reservoirs and the land use of the areas downstream and upstream of the dams and reservoirs has resulted in an increase in the volume of flows into the reservoirs, the rate at which the flows get to the reservoirs, the size of the pool generated within the reservoirs, and the time it takes to empty the reservoirs.  This can be seen by looking at the top 10 pools for Addicks and Barker Reservoirs.  Of the top 10 at Addicks, 8 have occurred since 1990.  Of the top 10 at Barker, 9 have occurred since 1990. (emphasis added)

4.12    The Corps also analyzed the probability of impounding floodwater beyond the GOL limits during various predicted weather events.  For Addicks, the Corps calculated that GOL limits had a 38% probability of being exceeded during a 250-year storm (i.e., a .4% annual chance weather event).

4.13    For Barker, the Corps calculated that GOL limits had a 50% probability of being exceeded during a 100-year storm (i.e., a 1% annual chance weather event).  Accordingly, it was highly foreseeable to the Corps that, during even a 100-year storm, the Corps' standard reservoir regulation procedures would result in the intentional impoundment and storage of floodwater beyond the GOL limits.

4.14    Since 2005 the Corps has discovered additional deficiencies in the dam system calling for risk reduction measures.  The Corps adopted a plan to address these deficiencies – which includes setting the maximum pool elevations for Addicks and Barker significantly lower, such that the Corps recognizes that a single rainfall event greater than approximately 16 inches would result in the Corps' storage of impounded floodwater beyond the GOL limits.  For Barker, a single event rainfall greater than 12.9 inches would result in the storage of impounded floodwater beyond the GOL limits.

4.15    At least by May of 1996, the Corps was aware that the Barker and Addicks Reservoirs could no longer adequately collect, hold and discharge flood waters properly during predictable rain events.  At that time, the Harris County Flood Control District ("HCFCD") completed a study concluding:

> . . . with the addition of gates and restrictive operations criteria to limit reservoir discharges and the substantial amount of urban developments now occurring in both the fringe areas and throughout both of the watersheds, the project's original design parameters and assumptions are severely outdated and invalid.

*Ex. A. – Katy Freeway Corridor Flood Control Study*, Harris County Flood Control District Planning Department, May 1996, p. 6 (hereafter "1996 HCFCD Study").

4.16    An event the magnitude of Hurricane Harvey was not needed to cause flooding form the Reservoirs, rather, localized rainfall would produce the same result.

> For the multiple storm scenario analysis using the December 1991 to mid-March 1992 rainy period and centering the March 4, 1992 storm even 10-miles to the west of where it actually occurred, Addicks Reservoir would have reached a pool level 3.8 feet higher (Elevation 104.4) than its record level (Elevation 100.6) . . .

Exhibit A, p. 9.  Instead, "[j]ust a wet period, consisting of a series of 'normal' frequent storms (like the rainy period between November 1991 and June 1992) is enough to 'ratchet' reservoir levels upward and severely flood private properties". Ex. A at 2.  The 1996 HCFCD Study further

found that "[t]he primary flood threat facing the citizens of west Harris County and west Houston comes from the inability to drain the Addicks and Barker reservoirs in an efficient manner". *Id.*

4.17    The 1996 HCFCD Study was shared with and known to the Corps.

4.18    The Corps considered and discussed the 1996 HCFCD Study.

## *The United States' Taking of Property*

4.19    On August 25, 2017 at 8:00 p.m., as Hurricane Harvey began to inundate Houston with heavy rain, the Corps ordered the floodgates to the two federally owned and operated systems of dams and reservoirs, the Addicks and Barker reservoirs, to be closed.  The storm ultimately brought in over 30 inches of rain, nearly twice the volume of water beyond the GOL limits discussed above.

4.20    During the course of the storm, the Corps issued statements concerning the status of the reservoirs and its actions:

> On Friday, August 25, 2017, the Corps educated the public on the procedures ahead; he explained that "both reservoirs are normally kept dry to preserve their overall capacity to impound floodwater and reduce flood levels in Buffalo Bayou". The Corps also explained that in accordance with the Corps' standard protocols, "when a rain event occurs, the gates are closed on the Addicks and Barker dams to reduce flooding impacts to residents downstream.  When downstream runoff recedes to nondamaging stages, reservoir operations resume, and the gates are re-opened to release water back to normal levels".  (PR 17-028)

> The same day, the Corps issued a subsequent press release confirming that the Reservoirs were currently empty and were functioning under normal conditions. (PR 17-029)

> On Sunday, August 27, 2017, the corps stated that it would likely have to release "intermittent amounts" of floodwater from both Addicks and Barker "to reduce the risk to the Houston metropolitan area".  The Corps' local district commander, stated that "[t]hese structures continue to perform as they were designed to do, which is to protect against flooding in downtown Houston and the Houston Ship Channel".  The Corps also stated that structures will be impacted upstream from the Reservoirs, and that the Corps expected to retain floodwater for approximately one to three months after the rain subsides. (PR-030)

An August 28, 2017, the Corps announced that both reservoirs were rising by more than half a foot per hour, and that "according to Corps models", upstream homes would start flooding in a matter of hours. The Corps also announced that it planned to start releasing impounded floodwater into Buffalo Bayou at 1,600 cfs, and would increase the release rate to 8,000 cfs over the next 6 to 10 hours. (PR 17-031).

In its next August 28th press release, the Corps admitted that, as of 5 p.m., the impounded floodwater from Addicks and Barker dams "extends beyond the government-owned reservoir land". The Corps stated that at that time the pool elevations were 105 and 99 feet for Addicks and Barker, respectively. (PR 17-032). Thus, by August 28, 2017, the Corps had intentionally impounded floodwaters in both Reservoirs on private property well beyond the GOL limits.

On August 30, 2017, the Corps indicated that it had made the decision to make increased controlled releases to maintain control of the Addicks and Barker Dams. (PR 17-033). The controlled releases eventually reached 16,000 cfs, and, as predicted, did massive damage to the downstream structures located in the Buffalo Bayou corridor. The Corps explained that the increased releases were necessary because pool <u>elevations threatened the Corps' structures</u>, and because rapid inflows to the Reservoirs impacted the normal operation of the gates, and could have caused unacceptable risk to the spillway. (PR 17-033). Emphasis added.

4.21    The Corps purposefully operated both Reservoirs with the intent of holding detained floodwater on private property owned by Plaintiffs. These operations were consistent with the Reservoir's public purpose: to prevent flooding downstream in the Buffalo Bayou corridor and downtown Houston.

4.22    Plaintiffs' homes and property became a repository for reservoir water, ousting Plaintiffs from their homes, which along with their cars and personal effects and waited an extended period of time before draining.

4.23    Plaintiffs suffered loss of personal property and their homes devalued, rendered completely uninhabitable, and permanently damaged. Plaintiffs will need to expend significant resources to remediate, repair, and/or rebuild their homes.

4.24    Due to the nature of the Corps' actions, Plaintiffs were largely unable to mitigate the damage to their real and personal property caused by the intentional flooding.

## V.
## CAUSE OF ACTION

5.1     Plaintiffs adopt and incorporate by reference all allegations made above.

5.2     The Fifth Amendment to the U.S. Constitution provides that when the government takes private property for public use, the government must pay just compensation.

5.3     Under Texas law, Plaintiffs had private property interests in the personal and real property located at their residence.  The Corps' intentional impoundment of reservoir water as described above took and destroyed Plaintiffs' private property.

5.4     Plaintiffs had distinct, reasonable, and investment-backed expectations that their properties would not be subject to flooding or such impoundment, in line with historical flooding patterns.

5.5     For its benefit and the benefit of the public, the Government intentionally impounded and detained floodwater on Plaintiffs' property and, in the process, preempted Plaintiffs' right to use and enjoy their property.

5.6     By purposefully inundating, destroying, damaging and/or devaluing Plaintiffs' property in August-September 2017, the Government took a permanent interest in Plaintiffs' property.

5.7     The inundation of, destruction of, substantial damage to, and/or devaluation of Plaintiffs' property and businesses resulting from the Government's purposeful storage of detained floodwater in August-September 2017 therefore constitutes a physical taking of Plaintiffs property by the Government without just compensation, all in violation of the takings clause of the Fifth Amendment to the United States Constitution.

5.8     In addition, the Government's above-described long-term flood control program, which enables it to impound and detain floodwaters at its discretion, further demonstrates and

confirms the Government's permanent commitment to repeatedly store impounded floodwater on Plaintiffs' property whenever the Reservoirs' pool elevations exceed the GOL limits. The Addicks and Barker Dams can both detain, impound, and store more water than the Government owns real estate on which to store it. Thus, by definition, and by application of fundamental hydrology principles, each time the Government impounds floodwater at pool elevations greater than 102 and 95.5 feet for Addicks and Barker, respectively, the Government will flood properties and businesses located in the above-described "fringe areas".

5.9    Accordingly, the Government's violations of the takings clause of the Fifth Amendment to the United States Constitution are ongoing, continuous and permanent. Pursuant to this permanent, ongoing, and continuous flood control program, which is carried out by and through the authorized actions of the Corps, the Government – in violation of the takings clause of the Fifth Amendment to the United States Constitution – appropriated inundation, drainage, and/or flowage easements over Plaintiffs property without just compensation.

5.10    The inundation, destruction of, substantial damage to, and/or devaluation of Plaintiffs' homes, businesses, buildings, structures, equipment, and other real and personal property was the natural, direct, foreseeable, and probable consequence of the Government's authorized actions.

5.11    As a direct result of the Corps' decisions and actions, Plaintiffs' homes and private property were flooded, which caused damage to personal property, such as personal vehicles and personal effects; damage to home improvements and the structures on the property; and decreased market value to the real estate resulting from the Corps' decision to appropriate Plaintiffs' property as a flooding easement. Specifically:

5.11.1 Mr. and Mrs. Anthony have suffered damages to their real and personal property, including personal vehicles and personal effects; damage to their physical home, home improvements, and the structures on the property; and decreased market value of their real property resulting from the Corps' decision to appropriate their property as a flooding easement.

5.11.2 Mr. Bonilla has suffered damages to his real and personal property, including personal vehicles and personal effects; damage to his physical home, home improvements, and the structures on the property; and decreased market value of his real property resulting from the Corps' decision to appropriate his property as a flooding easement.

5.11.4 Church on the Rock of Katy, Ins. has suffered damages to its real property, including contents and vehicles; damage to the structures on the property; and decreased market value of its real property resulting from the Corps' decision to appropriate their property as a flooding easement.

5.11.5 Ms. Castillo has suffered damages to her real and personal property, including personal vehicles and personal effects; damage to her physical home, home improvements, and the structures on the property; and decreased market value of her real property resulting from the Corps' decision to appropriate her property as a flooding easement.

5.11.6 Ms. Curry has suffered damages to her real and personal property, including personal vehicles and personal effects; damage to her physical home, home improvements, and the structures on the property; and decreased market value of her real property resulting from the Corps' decision to appropriate her property as a flooding easement.

5.11.7 Mr. El-Issa has suffered damages to his real and personal property, including personal vehicles and personal effects; damage to his physical home, home improvements, and the

structures on the property; and decreased market value of his real property resulting from the Corps' decision to appropriate his property as a flooding easement.

5.11.8 Ms. Elliott has suffered damages to her real and personal property, including personal vehicles and personal effects; damage to her physical home, home improvements, and the structures on the property; and decreased market value of her real property resulting from the Corps' decision to appropriate her property as a flooding easement.

5.11.9 Mr. Escoffery has suffered damages to his real and personal property, including personal vehicles and personal effects; damage to his physical home, home improvements, and the structures on the property; and decreased market value of his real property resulting from the Corps' decision to appropriate his property as a flooding easement.

5.11.10    Mr. Ihek has suffered damages to his real and personal property, including personal vehicles and personal effects; damage to his physical home, home improvements, and the structures on the property; and decreased market value of his real property resulting from the Corps' decision to appropriate his property as a flooding easement.

5.11.11    Mr. Nguyen has suffered damages to his real and personal property, including personal vehicles and personal effects; damage to his physical home, home improvements, and the structures on the property; and decreased market value of his real property resulting from the Corps' decision to appropriate his property as a flooding easement.

5.11.12    Mr. Okoli has suffered damages to his real and personal property, including personal vehicles and personal effects; damage to his physical home, home improvements, and the structures on the property; and decreased market value of his real property resulting from the Corps' decision to appropriate his property as a flooding easement.

5.11.13      Ms. Ortega has suffered damages to her real and personal property, including personal vehicles and personal effects; damage to her physical home, home improvements, and the structures on the property; and decreased market value of her real property resulting from the Corps' decision to appropriate her property as a flooding easement.

5.11.14      Mr. Reifschneider has suffered damages to his real and personal property, including personal vehicles and personal effects; damage to his physical home, home improvements, and the structures on the property; and decreased market value of his real property resulting from the Corps' decision to appropriate his property as a flooding easement.

5.11.15      Ms. Richardson has suffered damages to her real and personal property, including personal vehicles and personal effects; damage to her physical home, home improvements, and the structures on the property; and decreased market value of her real property resulting from the Corps' decision to appropriate her property as a flooding easement.

5.11.16      Mr. Rinaldi has suffered damages to his real and personal property, including personal vehicles and personal effects; damage to his physical home, home improvements, and the structures on the property; and decreased market value of his real property resulting from the Corps' decision to appropriate his property as a flooding easement.

5.11.17      Mr. Ruiz has suffered damages to his real and personal property, including vehicles and effects; damage to improvements, and the structures on the property; and decreased market value of his real property resulting from the Corps' decision to appropriate his property as a flooding easement.

5.11.18      Ms. Sandifer has suffered damages to her real and personal property, including personal vehicles and personal effects; damage to her physical home, home

improvements, and the structures on the property; and decreased market value of her real property resulting from the Corps' decision to appropriate her property as a flooding easement.

5.11.19    Mr. Uduak has suffered damages to his real and personal property, including personal vehicles and personal effects; damage to his physical home, home improvements, and the structures on the property; and decreased market value of his real property resulting from the Corps' decision to appropriate his property as a flooding easement.

5.11.20    Ms. Ventura has suffered damages to her real and personal property, including personal vehicles and personal effects; damage to her physical home, home improvements, and the structures on the property; and decreased market value of her real property resulting from the Corps' decision to appropriate her property as a flooding easement.

5.11.21    Ms. White has suffered damages to her real and personal property, including personal vehicles and personal effects; damage to her physical home, home improvements, and the structures on the property; and decreased market value of her real property resulting from the Corps' decision to appropriate her property as a flooding easement.

5.11.22    Ms. Williams has suffered damages to her real and personal property, including personal vehicles and personal effects; damage to her physical home, home improvements, and the structures on the property; and decreased market value of her real property resulting from the Corps' decision to appropriate her property as a flooding easement.

5.12    The Corps' decisions and actions deprived Plaintiffs' of the use, occupancy, and enjoyment of their homes and properties, which was a substantial and severe injury.

5.13    The United States has not compensated or offered to compensate Plaintiffs for the taking of their real and personal property.

## VI.
## RELIEF SOUGHT

***Request for Just Compensation***

6.1    The destruction of, substantial damage to, and devaluation of residences, along with their contents and other property, resulted from the Defendant's intentional decision to use the Plaintiffs' land.   The United States Constitution requires just compensation under the Fifth Amendment, which Plaintiffs have not received.

6.2    Plaintiffs believe that to be justly compensated, those affected by the Corps' induced flooding should receive at least the following:

    a.    The fair market rental value of their property for the time they will be unable to live in or use their properties;

    b.    The fair market value of the personal property, vehicles, equipment, and other items of value contained in or located on Plaintiffs' properties;

    c.    The actual cost to repair and replace the property taken or made useless by the flooding and, where repair cannot be made, the replacement value of the building; and

    d.    The lost market value of the properties due to the stigma associated with the flooding, either because properties, never before flooded, are now regarded as flood prone, because "black" water was introduced into homes and properties, or otherwise.

***Attorneys' Fees, Litigation Expenses, and Costs***

6.3    Plaintiffs are also entitled to recover reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred in this proceeding, pursuant to 42 U.S.C. § 4652, and Rule 54 of the Rules of the United States Court of Federal Claims.

**VII.**
**PRAYER**

Plaintiffs pray that, after due proceedings, there be judgment rendered herein in their favor against the United States for all sums that are reasonable including, without limitation thereby, actual damages to Plaintiffs' real and personal property, reasonable fees and expenses incurred herein, together with pre- and post-judgment interest and all other relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

**Woodfill Law Firm, P.C.**


 */s/ Jared R. Woodfill*
Jared R. Woodfill (lead attorney)
Fed. No. 17069; Texas Bar No. 00788715
woodfillservice@gmail.com (service email)
3 Riverway, Suite 750
Houston, Texas 77056
713-751-3080
713-751-3058 (Facsimile)

**Lill Firm, P.C.**

David S. Lill
Texas Bar No. 12352550
4407 Bee Cave Road #111
Austin, Texas 78746
512-330-0252

Attorneys for Plaintiffs